VAN ROSSUM v. GRAND RAPIDS BREWING CO.

EASEMENTS—ARTIFICIAL WATER-COURSE—JOINT OWNERSHIP.

M. and K., being joint owners of two lots, conducted water through a wooden pipe from a reservoir on one lot to a storage tank on the other, as part of a water-supply system for the city. They afterwards sold the system and leased the lots to a water company, under an agreement not to reengage in the water business. Subsequently the lots were divided without mention of water rights, M. becoming the sole owner of the lot on which the tank was located; and thereafter, the water company having abandoned the premises, the pipe leading to M.'s lot was cut off with her apparent acquiescence. She subsequently conveyed the lot by a deed not mentioning water rights. *Held*, that her grantee could not insist on a continuance of the flow of water to the lot as an easement appurtenant thereto.

Appeal from superior court of Grand Rapids; Newnham, J. Submitted January 28, 1902. Decided March 4, 1902.

Bill by Peter Van Rossum and Cornelius Van Rossum against the Grand Rapids Brewing Company and Fritz C. Jehle to enjoin interference with certain alleged water rights. From a decree dismissing the bill, complainants appeal. Affirmed.

*J. T. Preston,* for complainants.

*H. J. Felker* (*Knappen & Kleinhans,* of counsel), for defendants.

HOOKER, C. J. The accompanying plat will aid in making plain the controversy in this case.

KENT PLAT.

Complainants now own lot 213 of the Kent Plat, and defendant Jehle owns lots 214 and 215, all abutting upon Kusterer alley, in the city of Grand Rapids. The Grand Rapids Brewing Company owns a brewery situate south of East Bridge street, at the corner of Ionia. Lots 213 and 214 were owned jointly by John Mangold and Christopher Kusterer in 1869. At that time Mangold owned in severalty lot 228, and had the legal title to lot 215. It is, perhaps, not clear who claimed title to lot 226 at that time. The complainants assert that lots 228 and 226 were then called the "Mangold Lots." Counsel agree that at that time the lots east of Kusterer alley were springy, spongy, and marshy, and that previous to 1862 water overflowed from lot 226 or 228, or both, the bulk of which water flowed northwest. There is testimony that con-

vinces us that some of it went down Bridge street, which lay to the south. At that time little, if any, water found its way to lot 213, other than surface water, and that came from the northwest, and not from the lots east of the alley.

In 1869, Mangold and Kusterer, being then in control of all of these lots, constructed an artificial system of reservoirs and pipes for the purpose of supplying the city with water. They built a reservoir on lot 214, and accumulated water in it from the springs on lot 226. There was on lot 213 a building, used as a cooper shop, which had under it a cellar built of stone in the ordinary way. This cellar formed the storage tank of the system, water being conducted to it through a wooden pipe, which they laid from the reservoir on lot 214. This was the only source of water on lot 213 after 1869, and no water reached Bridge street thereafter, except such as might overflow from that cellar. The enterprise of Kusterer and Mangold was interrupted by a suit brought in 1869 by Christ Bros., who then owned lots 216 and 217, and who filed a bill to enjoin the construction of the water system, and to prevent them from establishing a reservoir, upon the ground that it would divert an alleged subterranean stream from their premises, where it was alleged to come to the surface as a perennial spring. The existence of the spring and subterranean stream was denied, and the bill was finally dismissed. See *Christ* v. *Kusterer*, 25 Mich. 354.

Kusterer and Mangold carried on the water business until 1873, when Mangold died, leaving his interest in the property to his widow, Christina C. Mangold, who, with Mr. Kusterer, continued the business until 1874, when they sold to the Hydraulic Company all pipes, shut-offs, stop-cocks, and artificial construction of every kind connected with the system, and leased to them lots 213 and 214 until the end of 1885, at an annual rental. At this time Mrs. Mangold and Kusterer owned lots 213, 214, and 215 jointly, Mrs. Mangold having sold to Kusterer a half interest in lot 215 in 1877. In the same writing by which.

they sold their pipes, etc., they agreed that, so long as the
Hydraulic Company continued in the water business, they
should not engage in the business of supplying water to
the inhabitants of Grand Rapids.  The Hydraulic Com-
pany occupied and made use of the premises until 1888 or
1889, when it abandoned the premises, though it con-
tinued, and still continues, in the water business.  These
reservoirs have never been used since in supplying the in-
habitants with water.

Kusterer died in 1880, and his wife, Maria D. Kusterer,
succeeded to his interest in the property.  In 1881 she
sold her one-half interest in lot 215 to Mrs. Mangold, and
in 1887 they divided their interests in lots 213 and 214;
Mrs. Kusterer becoming sole owner of lot 214, and Mrs.
Mangold sole owner of lot 213.  In 1888 Mrs. Kusterer
conveyed lot 214 to defendant Jehle, and in 1892 he pur-
chased lot 215.  Nothing was said in any of these deeds
about water rights, and Jehle did not know of the exist-
ence of the reservoirs for a long time thereafter.

After the Hydraulic Company ceased to use the water,
it accumulated and overflowed from the cellar, and ran
west on Bridge street, and later Jehle discovered the reser-
voir on 214 through the repairing of his house, and in
1895 he made a contract with the Grand Rapids Brew-
ing Company whereby the latter was given the right to
use the water in the reservoir on lot 214 for five years, at
$250 a year, with right of renewal for a similar term.
This renewal was made after this suit was begun.  The
brewing company laid its pipes in the alley, near the east
line, cut off the connection with the cellar on lot 213, and
made connection with the pipe leading from the reservoir
on lot 214, in the following manner:  A wooden box was
sunk and filled with material for filtration.  The old pipe
delivered the water into this box, and it was taken out by
the pipe leading to the brewery.  Mrs. Mangold, then the
owner of lot 213, made no objection to this.  In 1899 she
sold lot 213 to the complainants, water rights not being
mentioned.  No water had passed between the lots for

four years, and complainants knew of the arrangement with the brewing company.

The bill in this cause was filed in 1899. It claimed for the complainants a prescriptive right purchased from Mrs. Mangold to the flow of water through the pipe (which it calls an artificial channel) from lot 214 to lot 213. It alleged that since their purchase of lot 213 they had run a tile from the cellar to the east line of the lot, by means of which about 2,000 gallons of water was daily collected and conveyed to their cellar, and that the defendant was about to construct a concrete wall in said alley, to be builded upon the clay subsoil, extending north from its box or filter hereinbefore described to a point opposite the north line of complainants' lot 213, whereby all water would be cut off from lot 213. An injunction issued, and the threatened trench has not been digged, nor has the wall been constructed. Upon the hearing the court found that no subterranean stream was alleged or proved; that no prescriptive right to the maintenance of an artificial water-course was shown; that, when bought, lot 213 had no such appurtenance as the alleged water-course; and that the defendants had no design to cut off percolating waters, or in any way interfere with complainants' rights. The injunction was dissolved by the dismissal of the bill.

After this lengthy statement of the facts, but little remains to be said. We agree with the conclusions of the learned judge of the superior court that there was no proof that a subterranean stream existed, and that there was no attempt or design to interfere with percolating waters. It is unnecessary to determine whether the defendants are limited in their rights as to the appropriation of said waters. The wooden pipe between the two reservoirs was not the subject of adverse possession, as it was never held by any owner of lot 213 by a hostile title or use. It was not like a natural stream whose course had been changed and upon whose banks others had acquired rights. It was cut off from lot 213 with the apparent acquiescence of the owner of that lot, and when complain-

ants bought the lot it was in no sense appurtenant to it. If complainants are right in their contention, they have a right to compel the maintenance of the reservoir on lot 214, to the end that their water rights be not diminished, and Jehle could not remove the reservoir and drain his premises for building or other purposes. The only semblance of a valid claim is that lands had been used by joint owners as one parcel for a long time, and that, when they divided them, each took his parcel with existing appurtenances, and that to lot 213 a water right was appurtenant. But it must be remembered that at that time both had parted with the right to use the water for the purpose of supplying the city, and the reservoirs were abandoned. No tribute was ever afterwards exacted by Mrs. Mangold from the owner of lot 214, and, after Jehle's discovery of the reservoir, she saw the brewing company divert the water without objection. We think the correct view to take of this case is that these reservoirs were temporary structures for the purpose of the owners' business; that they never were treated as, nor understood to create, an easement, nor is there anything to indicate that there was any dominant or servient estate, but it would seem that the right of either to maintain them as a whole ended with their division of the lands. *Hanson* v. *McCue*, 42 Cal. 303 (10 Am. Rep. 299).

The decree of the superior court is affirmed, with costs.

MOORE, GRANT, and MONTGOMERY, JJ., concurred. LONG, J., did not sit.